

Office of the Clerk
**United States Court of Appeals for the Ninth Circuit**
Post Office Box 193939
San Francisco, California 94119-3939
415-355-8000

Molly C. Dwyer
Clerk of Court

May 03, 2013

No.:            13-71565
Short Title:    Northwest Environmental Advoc., et al v. EPA

Dear Petitioners/Counsel

Your Petition for Review has been received in the Clerk's office of the United States Court of Appeals for the Ninth Circuit. The U.S. Court of Appeals docket number shown above has been assigned to this case. You must indicate this Court of Appeals docket number whenever you communicate with this court regarding this case.

**The due dates for filing the parties' briefs and otherwise perfecting the petition have been set by the enclosed "Time Schedule Order," pursuant to applicable FRAP rules. These dates can be extended only by court order. Failure of the petitioner to comply with the time schedule order will result in automatic dismissal of the petition. 9th Cir. R. 42-1.**

**Payment of the $450.00 U.S. Court of Appeals docket fee is past due.**
Petitioners shall correct this deficiency **within 14 days**. Failure to respond to this order within the time set out will result in the dismissal of the appeal for failure to prosecute. See 9th Cir. R. 42-1. The fee is payable to the Clerk of this court.

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

MAY 03 2013

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

---

NORTHWEST ENVIRONMENTAL
ADVOCATES; CENTER FOR
BIOLOGICAL DIVERSITY,

               Petitioners,

  v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

               Respondent.

No. 13-71565

Environmental Protection Agency

**TIME SCHEDULE ORDER**

---

The parties shall meet the following time schedule.

| | |
|---|---|
| **Fri., May 10, 2013** | Mediation Questionnaire due. If your registration for Appellate ECF is confirmed after this date, the Mediation Questionnaire is due within one day of receiving the email from PACER confirming your registration. |
| **Mon., July 22, 2013** | Petitioners' opening brief and excerpts of record shall be served and filed pursuant to FRAP 32 and 9th Cir. R. 32-1. |
| **Wed., August 21, 2013** | Respondent's answering brief and excerpts of record shall be served and filed pursuant to FRAP 32 and 9th Cir. R. 32-1. |

**The optional petitioners' reply brief shall be filed and served within fourteen days of service of the respondent's brief, pursuant to FRAP 32 and 9th Cir. R. 32-1.**

**Failure of the petitioners to comply with the Time Schedule Order will result in automatic dismissal of the appeal. See 9th Cir. R. 42-1.**

FOR THE COURT:
Molly C. Dwyer
Clerk of Court

Holly Crosby
Deputy Clerk

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ALEX KOZINSKI                                                      (626)  229-7140
Chief Judge                                                         Fax:   229-7444

Dear Counsel:

I write to introduce you to the court's mediation program.

The court offers you and your clients professional mediation services, at no
cost, to help resolve disputes quickly and efficiently and to explore the
development of more satisfactory results than can be achieved from continued
litigation.  Each year the mediators facilitate the resolution of hundreds of cases,
from the most basic contract and tort actions to the most complex cases involving
multiple parties, numerous pieces of litigation and important issues of public
policy.

The nine circuit mediators, all of whom work exclusively for the court, are
highly experienced attorneys from a variety of practices; all have extensive training
and experience in negotiation, appellate mediation, and Ninth Circuit practice and
procedure.  Although the mediators are court employees, they are well shielded
from the rest of the court's operations.  The court has adopted strict confidentiality
rules and practices to ensure that what goes on in mediation stays in mediation.
See Circuit Rule 33-1.

The first step in the mediation process is case selection. To assist the
mediators in the case selection process, appellants/petitioners must file a completed
Mediation Questionnaire within 7 days of the docketing of the case.  See Circuit
Rules 3-4, and 15-2.  Appellees may also fill out and file a questionnaire.  The
questionnaire with filing instructions accompanies this letter and is also available
at www.ca9.uscourts.gov/mediation/forms.php.   All counsel are also invited to
submit, by e-mail to ca09_mediation@ca9.uscourts.gov, additional, confidential
information that might assist the mediator in the case selection process.

In most cases, the mediator will schedule a settlement assessment
conference, with counsel only, to determine whether the case is suitable for
mediation.  Be assured that participation in the mediation program will not slow
down disposition of your appeal.  Mediation discussions are not limited to the
issues on appeal. The discussions can involve other cases and may include

125 SOUTH GRAND AVENUE  •  PASADENA  •  CALIFORNIA 91105

Page Two

individuals who are not parties to the litigation, if doing so enables the parties to reach a global settlement.

Further information about the mediation program may be found on the court's website: www.ca9.uscourts.gov/mediation.  Please address questions directly to the Mediation Program at 415-355-7900 or ca09_mediation@ca9.uscourts.gov.

Sincerely,

Alex Kozinski

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

Circuit Mediation Office
Phone (415) 355-7900 Fax (415) 355-8566
http://www.ca9.uscourts.gov/mediation

## MEDIATION QUESTIONNAIRE

The purpose of this questionnaire is to help the court's mediators provide the best possible mediation service in this case; it serves no other function. Responses to this questionnaire are ***not*** confidential. Appellants/Petitioners must electronically file this document within 7 days of the docketing of the case. 9th Cir. R. 3-4 and 15-2. Appellees/Respondents may file the questionnaire, but are not required to do so.

9th Circuit Case Number(s):

District Court/Agency Case Number(s):

District Court/Agency Location:

Case Name:                    v.

If District Court, docket entry number(s) of order(s) appealed from:

Name of party/parties submitting this form:

Please briefly describe the dispute that gave rise to this lawsuit.

Briefly describe the result below and the main issues on appeal.

*(Please continue to next page)*

Describe any proceedings remaining below or any related proceedings in other tribunals.

Provide any other thoughts you would like to bring to the attention of the mediator.

Any party may provide additional information *in confidence* directly to the Circuit Mediation Office at ca09_mediation@ca9.uscourts.gov.  Please provide the case name and Ninth Circuit case number in your message.  Additional information might include interest in including this case in the mediation program, the case's settlement history, issues beyond the litigation that the parties might address in a settlement context, or future events that might affect the parties' willingness or ability to mediate the case.

## CERTIFICATION OF COUNSEL

I certify that:

☐ a current service list with telephone and fax numbers and email addresses is attached (see 9th Circuit Rule 3-2).

☐ I understand that failure to provide the Court with a completed form and service list may result in sanctions, including dismissal of the appeal.

Signature [                                        ]

("s/" plus attorney name may be used in lieu of a manual signature on electronically-filed documents.)

Counsel for [                                        ]

**Note:** Use of the Appellate ECF system is mandatory for all attorneys filing in this Court, unless they are granted an exemption from using the system. **File this document electronically** in Appellate ECF by choosing Forms/Notices/Disclosure > File a Mediation Questionnaire.

# UNITED STATES COURT OF APPEALS for the NINTH CIRCUIT

## Office of the Clerk

### After Opening a Case – Counseled Non-Immigration Agency Cases
*(revised March 2013)*

## Court Address – San Francisco Headquarters

| *Mailing Address for U.S. Postal Service* | *Mailing Address for Overnight Delivery (FedEx, UPS, etc.)* | *Street Address* |
|---|---|---|
| Office of the Clerk James R. Browning Courthouse U.S. Court of Appeals P.O. Box 193939 San Francisco, CA 94119-3939 | Office of the Clerk James R. Browning Courthouse U.S. Court of Appeals 95 Seventh Street San Francisco, CA 94103-1526 | 95 Seventh Street San Francisco, CA 94103 |

## Court Addresses – Divisional Courthouses

| *Pasadena* | *Portland* | *Seattle* |
|---|---|---|
| Richard H. Chambers Courthouse 125 South Grand Avenue Pasadena, CA 91105 | Pioneer Courthouse 700 SW 6th Ave, Ste 110 Portland, OR 97204 | William K. Nakamura Courthouse 1010 Fifth Avenue Seattle, WA 98104 |

## Court Website – www.ca9.uscourts.gov

The Court's website contains the Court's Rules and General Orders, information about electronic filing of documents, answers to frequently asked questions, directions to the courthouses, forms necessary to gain admission to the bar of the Court, opinions and memoranda, recordings of oral arguments, links to practice manuals, and an invitation to join our Pro Bono Program.

**Court Phone List**

| | |
|---|---|
| **Main Phone Number**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **(415) 355-8000** |

Attorney Admissions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (415) 355-7800

Calendar Unit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (415) 355-8190

Docketing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (415) 355-7840

Death Penalty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (415) 355-8197

Electronic Filing – Appellate ECF. . . . . . . . . . . . . . . . . . . . . Send email to
cmecf_ca9help@ca9.uscourts.gov

Library. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (415) 355-8650

Mediation Unit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (415) 355-7900

Motions Attorney Unit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . (415) 355-8020

Procedural Motions Unit. . . . . . . . . . . . . . . . . . . . . . . . . . . (415) 355-7860

Records Unit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (415) 355-7820

Divisional Court Offices:
    Pasadena. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (626) 229-7250
    Portland. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (503) 833-5300
    Seattle. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (206) 224-2200

**Electronic Filing - Appellate ECF**

The Ninth Circuit's Appellate ECF (Electronic Case Files) system is <u>mandatory</u> for all attorneys filing in this Court, unless they are granted an exemption. All non-exempted attorneys who appear in an ongoing case are required to register for and to use the Appellate ECF system. Registration and information about ECF is available on the Court's website at www.ca9.uscourts.gov under *Electronic Filing–ECF*. Read the Circuit Rules, especially Ninth Circuit Rule 25-5, for guidance on Appellate ECF, including which documents can and cannot be filed electronically.

**Rules of Practice**

The Federal Rules of Appellate Procedure (Fed. R. App. P.), the Ninth Circuit Rules (9th Cir. R.) and the General Orders govern practice before this Court. The rules are available on the Court's website at www.ca9.uscourts.gov under *Rules.*

**Practice Resources**

The Court has prepared a practice guide video entitled *Perfecting Your Appeal.* The video may be viewed for free on the Court's website at www.ca9.uscourts.gov under *FAQs, Forms and Instructions -> Guides and Legal Outlines*, and may be purchased through the Clerk's office in San Francisco for $15.00. Continuing legal education credit for viewing this videotape is available in most jurisdictions.

**Admission to the Bar of the Ninth Circuit**

All attorneys practicing before the Court must be admitted to the Bar of the Ninth Circuit. Fed. R. App. P. 46(a); 9th Cir. R. 46-1.1 & 46-1.2.

To apply for admission, obtain an application on the Court's website at www.ca9.uscourts.gov under *Forms* or by calling (415) 355-7800. If you are registered for the 9th Circuit's Appellate ECF system, upload your application and pay the $230.00 fee with a credit card by logging into Appellate ECF and clicking on Utilities > Attorney Admission. Otherwise, mail the application to the Clerk's Office in San Francisco with the admission fee of $230.00. Your check or money order must be included with the application.

**Notice of Change of Address**

Counsel who are registered for Appellate ECF must update their personal information, including street addresses and/or email addresses, online at: https://pacer.psc.uscourts.gov/psco/cgi-bin/cmecf/ea-login.pl 9th Cir. R. 46-3.

Counsel who have been granted an exemption from using Appellate ECF must file a written change of address with the Court. 9th Cir. R. 46-3.

**Payment of Fees**

The $450.00 filing fee or a motion to proceed in forma pauperis shall accompany the petition for review.  9th Cir. R. 3-1.

A motion to proceed in forma pauperis must be supported by the affidavit of indigency found at Form 4 of the Federal Rules of Appellate Procedure, available at the Court's website, www.ca9.uscourts.gov, under *Forms*.

Failure to satisfy the fee requirement or to apply to proceed without payment of fees will result in the petition's dismissal.  9th Cir. R. 42-1.

**Motions Practice**

Following are some of the basic points of motion practice, governed by Fed. R. App. P. 27 and 9th Cir. R. 27-1 through 27-13.

- Neither a notice of motion nor a proposed order is required.  Fed. R. App. P. 27(a)(2)(C)(ii), (iii).
- Motions may be supported by an affidavit or declaration.  28 U.S.C. § 1746.
- Each motion should provide the position of the opposing party.  Circuit Advisory Committee Note to Rule 27-1(5); 9th Cir. R. 31-2.2(b)(6).
- A response to a motion is due 10 days from the service of the motion.  Fed. R. App. P. 27(a)(3)(A).  The reply is due 7 days from service of the response.  Fed. R. App. P. 27(a)(4); Fed. R. App. P. 26(c).
- A response requesting affirmative relief and/or relief by a date certain must include that request in the caption.  Fed. R. App. P. 27(a)(3)(B).
- A motion filed after a case has been scheduled for oral argument, has been argued, is under submission or has been decided by a panel, must include on the initial page and/or cover the date of argument, submission or decision and, if known, the names of the judges on the panel.  9th Cir. R. 25-4.

**Emergency or Urgent Motions**

All emergency and urgent motions must conform with the provisions of 9th Cir. R. 27-3.  Note that a motion requesting procedural relief (e.g., an extension of time to file a brief) is *not* the type of matter contemplated by 9th Cir. R. 27-3.  Circuit Advisory Committee Note to 27-3(3).

Prior to filing an emergency motion, the moving party *must* contact an attorney in the Motions Unit in San Francisco at (415) 355-8020.

When it is absolutely necessary to notify the Court of an emergency outside of standard office hours, the moving party shall call (415) 355-8000. Keep in mind that this line is for true emergencies that cannot wait until the next business day (e.g., an imminent execution or removal from the United States).

## Briefing Schedule

The Court sets the briefing schedule at the time the petition for review is docketed.

Certain motions (e.g., a motion for dismissal) automatically stay the briefing schedule. 9th Cir. R. 27-11.

The opening and answering brief due dates (and any other deadline set for a date certain by the Court) are not subject to the additional time described in Fed. R. App. P. 26(c). The early filing of petitioner's opening brief does not advance the due date for respondent's answering brief. 9th Cir. R. 31-2.1.

## Extensions of Time to file a Brief

*Streamlined Request*
If you have not yet asked for any extension of time to file the brief, you may request one streamlined extension of up to 30 days from the brief's existing due date. Submit your request via the Appellate ECF system using the "File a Streamlined Request to Extend Time to File Brief" event on or before your brief's existing due date. No form or written motion is required.

*Written Extension*
Requests for extensions of more than 14 days will be granted only upon a written motion supported by a showing of diligence and substantial need. This motion shall be filed at least 7 days before the due date for the brief. The motion shall be accompanied by an affidavit or declaration that includes all of the information listed at 9th Cir. R. 31-2.2(b).

The Court will ordinarily adjust the schedule in response to an initial motion. Circuit Advisory Committee Note to Rule 31-2.2. The Court expects that the brief

will be filed within the requested period of time.  *Id.*

## Contents of Briefs and Record

The required components of a brief are set out at Fed. R. App. P. 28 and 32, and 9th Cir. R. 28-2, 32-1 and 32-2.

The content and filing of the record are governed by Fed. R. App. P. 16 and 17.  If respondent does not file the record or certified list by the specified date, petitioner may move to amend the briefing schedule.

## Excerpts of Record

The Court requires Excerpts of Record rather than an Appendix.  9th Cir. R. 17-1.1. Please review 9th Cir. R. 17-1.3 through 17-1.6 to see a list of the specific contents and format.  For Excerpts that exceed 75 pages, the first volume must comply with  9th Cir. R. 17-1.6 and 30-1.6(a).  Excerpts exceeding 300 pages must be filed in multiple volumes.  9th Cir. R. 30-1.6(b).

Respondent may file supplemental Excerpts, and petitioner may file further Excerpts. 9th Cir. R. 17-1.7; 17-1.8; 30-1.7 and 30-1.8.  If you are a respondent responding to a pro se brief that did not come with Excerpts, then your Excerpts need only include the contents set out at 9th Cir. R. 30-1.7.

Excerpts must be submitted in PDF format on Appellate ECF on the same day the filer submits the brief, unless the Excerpts contain sealed materials.  If the Excerpts contain sealed materials, please electronically submit only the unsealed volumes. The filer shall serve a paper copy of the Excerpts on any party not registered for Appellate ECF.

After electronic submission, the Court will direct the filer to file 4 separately-bound excerpts of record with <u>white</u> covers in paper copy.

## Mediation Program

Mediation Questionnaires are required in all counseled cases seeking review of an agency decision except those cases seeking review of a Board of Immigration Appeals decision.  9th Cir. R. 15-2.

The Mediation Questionnaire is available on the Court's website at www.ca9.uscourts.gov under *Forms*. The Mediation Questionnaire should be filed within 7 days of the docketing of the Petition for Review. The Mediation Questionnaire is used only to assess settlement potential.

If you are interested in requesting a conference with a mediator, you may call the Mediation Unit at (415) 355-7900, email ca09_mediation@ca9.uscourts.gov or make a written request to the Chief Circuit Mediator. You may request conferences confidentially. More information about the Court's mediation program is available at http://www.ca9.uscourts.gov/mediation.

**Oral Hearings**

Notices of the oral hearing calendars are distributed approximately 4 to 5 weeks before the hearing date.

The Court will change the date or location of an oral hearing only for good cause, and requests to continue a hearing filed within 14 days of the hearing will be granted only upon a showing of exceptional circumstances. 9th Cir. R. 34-2.

Oral hearing will be conducted in all cases unless all members of the panel agree that the decisional process would not be significantly aided by oral argument. Fed. R. App. P. 34.

## Ninth Circuit Appellate Lawyer Representatives
## APPELLATE MENTORING PROGRAM

1.    Purpose

       The Appellate Mentoring Program is intended to provide mentoring on a
voluntary basis to attorneys who are new to federal appellate practice or would
benefit from guidance at the appellate level.  In addition to general assistance
regarding federal appellate practice, the project will provide special focus on two
substantive areas of practice - immigration law and habeas corpus petitions.
Mentors will be volunteers who have experience in immigration, habeas corpus,
and/or appellate practice in general.  The project is limited to counseled cases.

2.    Coordination, recruitment of volunteer attorneys, disseminating information
about the program, and requests for mentoring

       Current or former Appellate Lawyer Representatives (ALRs) will serve as
coordinators for the Appellate Mentoring Program.  The coordinators will recruit
volunteer attorneys with appellate expertise, particularly in the project's areas of
focus, and will maintain a list of those volunteers.  The coordinators will ask the
volunteer attorneys to describe their particular strengths in terms of mentoring
experience, substantive expertise, and appellate experience, and will maintain a
record of this information as well.

       The Court will include information about the Appellate Mentoring Program
in the case opening materials sent to counsel and will post information about it on
the Court's website.  Where appropriate in specific cases, the Court may also
suggest that counsel seek mentoring on a voluntary basis.

       Counsel who desire mentoring should contact the court at
mentoring@ca9.uscourts.gov, and staff will notify the program coordinators. The
coordinators will match the counsel seeking mentoring with a mentor, taking into
account the mentor's particular strengths.

3.    The mentoring process

The extent of the mentor's guidance may vary depending on the nature of the case,
the mentee's needs, and the mentor's availability.  In general, the mentee should
initiate contact with the mentor, and the mentee and mentor should determine
together how best to proceed.  For example, the areas of guidance may range from

basic questions about the mechanics of perfecting an appeal to more sophisticated matters such as effective research, how to access available resources, identification of issues, strategy, appellate motion practice, and feedback on writing.

4.    Responsibility/liability statement

The mentee is solely responsible for handling the appeal and any other aspects of the client's case, including all decisions on whether to present an issue, how to present it in briefing and at oral argument, and how to counsel the client. By participating in the program, the mentee agrees that the mentor shall not be liable for any suggestions made. In all events, the mentee is deemed to waive and is estopped from asserting any claim for legal malpractice against the mentor.

The mentor's role is to provide guidance and feedback to the mentee. The mentor will not enter an appearance in the case and is not responsible for handling the case, including determining which issues to raise and how to present them and ensuring that the client is notified of proceedings in the case and receives appropriate counsel. The mentor accepts no professional liability for any advice given.

5.    Confidentiality statement

The mentee alone will have contact with the client, and the mentee must maintain client confidences, as appropriate, with respect to non-public information.

RECEIVED
OFFICE OF THE CLERK
U.S. COURT OF APPEALS

2013 MAY -3  AM 8: 35

FILED
DOCKETED 5/3/13 HC
DATE  INITIAL

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

NORTHWEST ENVIRONMENTAL          )
ADVOCATES; and CENTER FOR        )
BIOLOGICAL DIVERSITY,            )
                                 )
         Petitioners,            )
                                 )
     v.                          )
                                 )
UNITED STATES ENVIRONMENTAL      )
PROTECTION AGENCY,               )
                                 )
         Respondent.             )
_____)

No. **13-71565**

**PETITION FOR REVIEW**

PETITION FOR REVIEW OF AN ACTION
BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY

Northwest Environmental Advocates and Center for Biological Diversity

(collectively "Petitioners") hereby petition the Court for review of the U.S.

Environmental Protection Agency's ("EPA") action in issuing a new National

Pollutant Discharge Elimination System Vessel General Permit under the Federal

Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*, which authorizes

discharges incidental to the normal operation of non-military and non-recreational

vessels greater than or equal to 79 feet in length.  Notice of this action was

published in the Federal Register on April 12, 2013, at 78 Fed. Reg. 21,938, and

the Vessel General Permit will become effective on December 19, 2013.   A copy

1

of the Federal Register notice is attached hereto.  In accordance with the Federal

Register notice and 40 C.F.R. Part 23, the permit is considered issued for the

purpose of judicial review on the day two weeks after Federal Register publication,

or April 27, 2013, and therefore is ripe for review under 33 U.S.C. § 1369.

Petitioners are non-profit organizations formed to advocate for the

protection, preservation, and sound management of waters of the United States.

Petitioners have a substantial interest in the EPA's issuance of the VGP because

the federal action taken therein will have adverse impacts on the Petitioners' and

their members' interests in the unique aquatic ecosystems found in waters of the

United States.

Respectfully submitted this 3rd day of May, 2013.

Deborah A. Sivas (Cal. Bar No. 135446)
Alicia E. Thesing (Cal. Bar No. 211751)
ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, California  94305-8610
Telephone:  (650) 723-0325
Facsimile:   (650) 723-4426

Allison LaPlante (OSB No. 023614)
Daniel P. Mensher (OSB No. 074636)
PACIFIC ENVIRONMENTAL ADVOCACY
CENTER
10015 S.W. Terwilliger Boulevard
Portland, Oregon 97219-7799
Telephone: (503) 768-6894
Facsimile: (503) 768-6642

<u>Service List</u>

Bob Perciasepe, Acting Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C.  20460

Correspondence Control Unit
Office of General Counsel (2311)
U.S. Environmental Protection Agency
1200 Pennsylvania Ave, N.W.
Washington, D.C.  20460.

## ENVIRONMENTAL PROTECTION AGENCY

[ER–FRL–9008–6]

### Environmental Impacts Statements; Notice of Availability

Responsible Agency: Office of Federal Activities, General Information (202) 564–7146 or *http://www.epa.gov/ compliance/nepa/.*
Weekly receipt of Environmental Impact Statements
Filed 04/01/2013 Through 04/05/2013
Pursuant to 40 CFR 1506.9.

**Notice**

Section 309(a) of the Clean Air Act requires that EPA make public its comments on EISs issued by other Federal agencies. EPA's comment letters on EISs are available at: *http:// www.epa.gov/compliance/nepa/ eisdata.html.*

*EIS No. 20130086, Revised Final EIS, USFS, ID,* Lower Orogrande, North Fork Ranger District, Clearwater National Forest, Review Period Ends: 05/28/2013, Contact: George Harbaugh 208–935–4260.

*EIS No. 20130087, Draft EIS, BLM, NM,* TriCounty Resource Management Plan, Comment Period Ends: 07/11/ 2013, Contact: Jennifer Montoya 575– 525–4316.

*EIS No. 20130088, Final Supplement, BOEM, 00,* Gulf of Mexico OCS Oil and Gas Lease Sales: 2013–2014 Western Planning Area Lease Sale 233 Central Planning Area Lease Sale 231, Review Period Ends: 05/13/2013, Contact: Poojan B. Tripathi 703–787– 1738.

**Amended Notices**

*EIS No. 20130041, Draft EIS, USFS, AZ,* Salt River Allotments Vegetative Management, Comment Period Ends: 05/08/2013, Contact: Debbie Cress 928–467–3220, Revision to FR Notice Published 02/22/2013; Extending Comment Period from 04/08/2013 to 05/08/2013.

*EIS No. 20130047, Draft EIS, NPS, FL,* Everglades National Park Draft General Management Plan/East Everglades Wilderness Study, Comment Period Ends: 05/13/2013, Contact: Eric Thuerk 303–987–6852, Revision to FR Notice Published 03/ 01/2013; Extending Comment Period from 4/15/2013 to 5/13/2013.

Dated: April 9, 2013.

**Cliff Rader,**
*Director, NEPA Compliance Division, Office of Federal Activities.*
[FR Doc. 2013–08661 Filed 4–11–13; 8:45 am]
**BILLING CODE 6560–50–P**

## ENVIRONMENTAL PROTECTION AGENCY

[EPA–R3–PAL–001; FRL–9801–9]

### Notice of Issuance of Final Air Permit; Architect of the Capitol—Capitol Power Plant

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of final agency action.

**SUMMARY:** This action is to provide notice that on January 23, 2013, EPA issued a final air permit to the Architect of the Capitol for the Capitol Power Plant (CPP). This permit became effective on February 25, 2013.

The CPP permit establishes a plantwide applicability limit (PAL) for emissions of oxides of nitrogen as an indicator for nitrogen dioxide, particulate matter less than or equal to ten micrometers in diameter, and greenhouse gases. This action is being taken in accordance with EPA's procedures for decision making set forth at 40 CFR part 124 and the Clean Air Act (CAA).

**ADDRESSES:** The final permit, EPA's response to public comments, and additional supporting information are available at *http://www.epa.gov/ reg3artd/permitting/capitol_power.html.* Copies of the final permit and EPA's response to comments are also available for review at the EPA Region III office and upon request in writing. EPA requests that you contact the person listed in the **FOR FURTHER INFORMATION CONTACT** section to schedule your inspection. The Regional Office's official hours of business are Monday through Friday, 8:30 to 4:30 excluding federal holidays.

**FOR FURTHER INFORMATION CONTACT:** Mike Gordon, (215) 814–2039, or by email at *gordon.mike@epa.gov.*

**SUPPLEMENTARY INFORMATION:** On August 29, 2012, EPA published a request for public comment and notice of a public hearing for the CPP permit in the *Washington Times.* EPA received over 200 comments during the public comment period, which ended on October 1, 2012. EPA carefully reviewed each of the comments submitted, and after consideration of the expressed view of all interested persons, the pertinent federal statutes and regulations, the applications and additional material relevant to the applications and contained in the administrative record, EPA made a decision in accordance with 40 CFR 52.21 and 40 CFR part 124 to issue the final PAL permit to CPP. The permit was signed on January 23, 2013, and

notice of the final permit decision was provided in accordance with the requirements of 40 CFR 124.15. The District Department of the Environment (DDOE) is also in the process of issuing permits to CPP, however, the DDOE's permits are not part of this action.

Under 40 CFR 124.19(f)(2), notice of any final EPA action regarding a permit issued under the authority of 40 CFR 52.21 must be published in the **Federal Register**. Section 307(b)(1) of the CAA provides for review of any final EPA action in the United States Court of Appeals for the appropriate circuit. Such a petition for review of final EPA action must be filed within 60 days from the date of notice of such action in the **Federal Register**. For purposes of judicial review under the CAA, final EPA action occurs when a final Prevention of Significant Deterioration permit is issued or denied by EPA, and EPA review procedures are exhausted under 40 CFR 124.19(f)(1).

Any person who filed comments on the draft CPP permit was provided the opportunity to petition the Environmental Appeals Board by February 25, 2013. No petitions were submitted; therefore the CPP permit became effective on February 25, 2013.

Dated: March 28, 2013.

**Diana Esher,**
*Director, Air Protection Division, Region III.*
[FR Doc. 2013–08697 Filed 4–11–13; 8:45 am]
**BILLING CODE 6560–50–P**

## ENVIRONMENTAL PROTECTION AGENCY

[EPA–HQ–OW–2011–0141; FRL–9733–7]

### Final National Pollutant Discharge Elimination System (NPDES) General Permit for Discharges Incidental to the Normal Operation of a Vessel

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of final permit issuance.

**SUMMARY:** EPA Regions 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 are finalizing the NPDES Vessel General Permit (VGP) to authorize discharges incidental to the normal operation of non-military and non-recreational vessels greater than or equal to 79 feet in length. This VGP, which has an effective date of December 19, 2013, will replace the current VGP, which was issued in December 2008 and expires on December 19, 2013. EPA provided notice of the availability of the draft permit and accompanying fact sheet for public comment in the **Federal Register** on December 8, 2011. At that time, EPA also provided notice of

availability of the draft small Vessel General Permit, on which the Agency has not yet taken final action.

**DATES:** This permit is effective on December 19, 2013.

In accordance with 40 CFR part 23, this permit shall be considered issued for the purpose of judicial review on the day 2 weeks after **Federal Register** publication. Under section 509(b) of the Clean Water Act, judicial review of this general permit can be had by filing a petition for review in the United States Court of Appeals within 120 days after the permit is considered issued for purposes of judicial review. Under section 509(b)(2) of the Clean Water Act, the requirements in this permit may not be challenged later in civil or criminal proceedings to enforce these requirements. In addition, this permit may not be challenged in other agency proceedings. Deadlines for submittal of notices of intent are provided in Part 1.5 of the VGP. This permit also provides additional dates for compliance with the terms of this permit.

**FOR FURTHER INFORMATION CONTACT:** For further information on the VGP, contact Ryan Albert at 202–564–0763 or Juhi Saxena at 202–564–0719, or at EPA Headquarters, Office of Water, Office of Wastewater Management, Mail Code 4203M, 1200 Pennsylvania Ave. NW., Washington DC 20460; or email at vgp@epa.gov.

**SUPPLEMENTARY INFORMATION:** This supplementary information is organized as follows:

## Table of Contents

I. General Information
  A. Does this action apply to me?
  B. How can I get copies of this document and other related information?
  C. Public Outreach: Public Hearings and Public Meetings, Webcasts
  D. Who are the EPA regional contacts for the permit?
II. Background of Permit
  A. Statutory and Regulatory History
  B. The 2008 VGP
  C. National Research Council and Science Advisory Board Ballast Water Studies
III. Scope and Applicability of the 2013 VGP
  A. CWA Section 401 Certification and Coastal Zone Management Act
  B. Geographic Coverage of VGP
  C. Categories of Vessels Covered Under VGP
  D. Summary of the VGP and Significant Changes from the Proposed VGP
IV. Analysis of Economic Impacts of VGP
V. Executive Orders 12866 and 13563

## I. General Information

### A. Does this action apply to me?

This action applies to vessels operating in a capacity as a means of transportation that have discharges incidental to their normal operation into waters subject to this permit, except recreational vessels as defined in Clean Water Act section 502(25) and vessels of the Armed Forces as defined in Clean Water Act section 312(a)(14). For a discussion of applicability of this permit to fishing vessels greater than 79 feet in length and to ballast water discharges regardless of length, see section II.A below. Affected vessels are henceforth referred to as non-military, non-recreational vessels. Unless otherwise excluded from coverage by Part 6 of the VGP, the waters subject to this permit are waters of the U.S. as defined in 40 CFR 122.2. That provision defines "waters of the U.S." as certain inland waters and the territorial sea, which extends three miles from the baseline. More specifically, CWA section 502(8) defines "territorial seas" as "the belt of the seas measured from the line of the ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters, and extending seaward a distance of three miles." Note that the Clean Water Act (CWA) does not require NPDES permits for vessels or other floating craft operating as a means of transportation beyond the territorial seas, i.e., in the contiguous zone or ocean as defined by the CWA sections 502(9), (10). See CWA section 502(12) and 40 CFR 122.2 (definition of "discharge of a pollutant"). This permit, therefore, does not apply in such waters.

Non-military, non-recreational vessels greater than 79 feet in length operating in a capacity as a means of transportation that need NPDES coverage for their incidental discharges will generally be covered under the VGP.

### B. How can I get copies of this document and other related information?

1. *Docket.* EPA has established an official public docket for this action: Docket ID No. EPA–HQ–OW–2011– 0141. The official public docket is the collection of materials for the final permit. It is available for public viewing at the Water Docket in the EPA Docket Center, (EPA/DC) EPA West, Room 3334, 1301 Constitution Ave. NW., Washington, DC 20460. Although all documents in the docket are listed in an index, some information is not publicly available, i.e., Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Publicly available docket materials are available electronically through http://www.regulations.gov and in hard copy at the EPA Docket Center Public Reading Room, open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744 and the telephone number for the Water Docket is (202) 566–2426. Please note that EPA is in the process of uploading materials in to the docket and expects to be finished with that process by two weeks from the date of publication of this document in the **Federal Register**.

2. *Electronic Access.* You may access this **Federal Register** document electronically at www.federalregister.gov. An electronic version of the public docket is available through the Federal Docket Management System (FDMS) found at http://www.regulations.gov. You may use the FDMS to view public comments, access the index listing of the contents of the official public docket, and to access those documents in the public docket that are available electronically. Once at the Web site, enter the appropriate Docket ID No. in the "Search" box to view the docket.

Certain types of information will not be placed in the EPA dockets. Information claimed as CBI and other information whose disclosure is restricted by statute, which is not included in the official public docket, will not be available for public viewing in EPA's electronic public docket. EPA policy is that copyrighted material will not be placed in EPA's electronic public docket but will be available only in printed, paper form in the official public docket. Although not all docket materials may be available electronically, you may still access any of the publicly available docket materials through the docket facility identified in this section.

3. *Response to public comments.* EPA received 5,486 comments on the proposed VGP from the shipping industry, States, Tribes, environmental groups, foreign governments and the public. EPA has responded to all comments received and has included these responses in a separate document in the public docket for this permit. See the document titled *Proposed VGP: EPA's Response to Public Comments.*

### C. Public Outreach: Public Hearings and Public Meetings, Webcasts

Because EPA anticipated a significant degree of public interest in the draft VGP, EPA held a public hearing on Wednesday January 11, 2012 to receive public comment and answer questions concerning the draft permit. The hearing was held at EPA East Room 1153, 1201 Constitution Ave. NW., Washington DC 20460. In addition, EPA held a public meeting on Monday January 23, 2012, at

the Ralph H. Metcalfe Federal Building, Room 331, 77 West Jackson Blvd., Chicago IL 60604. The purpose of those meetings was to present the proposed requirements of the draft VGP and the basis for those requirements, as well as to answer questions concerning the draft permit. The public meetings and public hearing were attended by a wide variety of stakeholders including representatives from industry, government agencies, and environmental organizations. In addition, EPA held a webcast on January 19, 2012 and two Question and Answer sessions on January 31 and February 7, 2012 to provide information on the proposed permit and to answer questions from interested parties that were unable to attend the public meetings or hearing.

*D. Who are the EPA regional contacts for this permit?*

For EPA Region 1, contact John Nagle at US EPA, Region 1, New England/Office of Ecosystem Protection, 5 Post Office Square, Suite 100, Mail Code: OEP 06–1, Boston, MA 02109–3912; or at tel.: (617) 918–1054; or email at *nagle.john@epa.gov.*

For EPA Region 2, contact Sieglinde Pylypchuk at US EPA, Region 2, 290 Broadway, 24th Floor, New York, NY 10007–1866; or at tel.: (212) 637–4133; or email at *pylypchuk.sieglinde@epa.gov.* For Puerto Rico, contact Sergio Bosques at tel.: (787) 977–5838; or email at *bosques.sergio@epa.gov.*

For EPA Region 3, contact Mark Smith at US EPA, Region 3, 1650 Arch St., Mail Code: 3WP41, Philadelphia, PA 19103–2029, or at tel.: (215) 814–3105; or email at *smith.mark@epa.gov.*

For EPA Region 4, contact Marshall Hyatt at US EPA, Region 4 Water Protection Division, Atlanta Federal Center, 61 Forsyth St. SW., Atlanta, GA 30303–3104; or at tel.: (404) 562–9304; or email at *hyatt.marshall@epa.gov*

For EPA Region 5, contact Sean Ramach at US EPA, Region 5, 77 W Jackson Blvd., Mail Code: WN16J, Chicago, IL 60604–3507; or at tel.: (312) 886–5284; or email at *ramach.sean@epa.gov.*

For EPA Region 6, contact Jenelle Hill at U.S. EPA, Region 6, 1445 Ross Ave., Suite 1200, Dallas, TX 75202–2733; or at tel.: (214) 665–9737; or email at *hill.jenelle@epa.gov.*

For EPA Region 7, contact Alex Owutaka at U.S. EPA Region 7, 11201 Renner Boulevard, Lenexa, Kansas 66219; or at tel.: (913) 551–7584; or email at *owutaka.alex@epa.gov.*

For EPA Region 8, contact Lisa Luebke at US EPA, Region 8, 1595 Wynkoop St., Mail Code: 8P–W–WW, Denver, CO 80202–1129; or at tel.: (303) 312–6256; or email at *luebke.lisa@epa.gov.*

For EPA Region 9, contact Eugene Bromley at US EPA, Region 9, 75 Hawthorne St., San Francisco, CA 94105–3901; or at tel.: (415) 972–3510; or email at *bromley.eugene@epa.gov.*

For EPA Region 10, contact Cindi Godsey at US EPA, Region 10, 222 W 7th Ave., Box 19, Anchorage, AK 99513; or at tel.: (907) 271–6561; or email at *godsey.cindi@epa.gov.*

## II. Background of Permit

*A. Statutory and Regulatory History*

The Clean Water Act (CWA) section 301(a) provides that "the discharge of any pollutant by any person shall be unlawful" unless the discharge is in compliance with certain other sections of the Act. 33 U.S.C. 1311(a). The CWA defines "discharge of a pollutant" as "(A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." 33 U.S.C. 1362(12). A "point source" is a "discernible, confined and discrete conveyance" and includes a "vessel or other floating craft." 33 U.S.C. 1362(14).

The term "pollutant" includes, among other things, "garbage * * * chemical wastes * * * and industrial, municipal, and agricultural waste discharged into water." The Act's definition of "pollutant" specifically excludes "sewage from vessels or a discharge incidental to the normal operation of a vessel of the Armed Forces" within the meaning of CWA section 312. 33 U.S.C. 1362(6).

One way a person may discharge a pollutant without violating the CWA section 301 prohibition is by obtaining authorization to discharge (referred to herein as "coverage") under a CWA section 402 National Pollutant Discharge Elimination System (NPDES) permit (33 U.S.C. 1342). Under CWA section 402(a), EPA may "issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a)" upon certain conditions required by the Act.

EPA issued the original VGP in response to a District Court ruling which vacated a longstanding regulatory exemption for discharges incidental to the normal operation of vessels at 40 CFR 122.3(a). *Northwest Envtl. Advocates et al.* v. *United States EPA,* 2006 U.S. Dist. LEXIS 69476 (N.D. Cal. 2006). EPA developed the VGP to regulate incidental discharges from vessels operating in a capacity as a means of transportation. That permit was issued on December 18, 2008, with an effective date of December 19, 2008. 73 FR79,473 (Dec. 29, 2008). Subsequently, the U.S. District Court for the Northern District of California issued an order providing that "the exemption for discharges incidental to the normal operation of a vessel, contained in 40 CFR 122.3(a), is vacated as of February 6, 2009." *Northwest Environmental Advocates et al.* v. *United States EPA,* No. C 03–05760–SI (December 17, 2008). Therefore, the date when the regulated community was required to comply with the VGP was February 6, 2009.

On July 31, 2008 Congress enacted Public Law 110–299, which generally prohibited NPDES permitting for discharges incidental to the normal operation of commercial fishing vessels (regardless of size) and those other non-recreational vessels less than 79 feet in length for two years from enactment. This moratorium was subsequently extended to December 18, 2013, by Public Law 111–215. On December 20, 2012, President Obama signed the Coast Guard and Maritime Transportation Act of 2012, which extends the expiration date of the moratorium from December 18, 2013 to December 18, 2014. § 703 of Public Law 112–213. That moratorium does not include ballast water discharges. Therefore, commercial fishing vessels that are greater than 79 feet and do not have ballast water discharges will, barring further legislative action, not be required to seek coverage under the VGP until the moratorium expires on December 18, 2014. That moratorium also does not apply to other incidental discharges, which on a case-by-case basis, EPA or the State, as appropriate, determines contribute to a violation of water quality standards or pose an unacceptable risk to human health or the environment.

The original legislation called for EPA to study the relevant discharges and submit a report to Congress. EPA finalized this Report to Congress, entitled "Study of Discharges Incidental to Normal Operation of Commercial Fishing Vessels and Other Non-Recreational Vessels Less Than 79 Feet" in August 2010, and it can be viewed at: *http://cfpub.epa.gov/npdes/vessels/background.cfm.*

*B. The 2008 VGP*

The 2008 VGP addresses 26 potential vessel discharge streams by establishing effluent limits, including Best Management Practices (BMPs), to control the discharges of waste streams and constituents found in those waste

streams. For these discharges, the permit establishes effluent limits pertaining to the constituents found in the effluent and BMPs designed to decrease the amount of constituents entering the waste stream. A vessel might not produce all of these discharges, but a vessel owner or operator is responsible for meeting the applicable effluent limits and complying with all the effluent limits for every listed discharge that the vessel produces.

To obtain authorization, the owner or operator of a vessel that is either 300 or more gross registered tons or has the capacity to hold or discharge more than 8 cubic meters (2113 gallons) of ballast water is required to submit a Notice of Intent (NOI) to receive permit coverage, beginning six months after the permit's issuance date, but no later than nine months after the permit's issuance date. Owners or operators of vessels that meet the applicable eligibility requirements for permit coverage but are not required to submit an NOI, including vessels less than 300 gross registered tons with no more than 8 cubic meters of ballast water capacity are automatically authorized by the permit to discharge according to the permit requirements.

The 2008 VGP requires owners or operators of vessels to conduct routine self-inspections and monitoring of all areas of the vessel that the permit addresses. The routine self-inspections are required to be documented in the ship's logbook. Analytical monitoring of certain discharges is required for certain types of vessels. The VGP also requires owners or operators of vessels to conduct comprehensive annual vessel inspections, to ensure even the hard-to-reach areas of the vessel are inspected for permit compliance. If the vessel is placed in dry dock while covered under the permit, a dry dock inspection and report is required to be completed. Additional monitoring requirements are imposed on owners or operators of certain classes of vessels, based on their unique characteristics.

For additional information on the 2008 VGP, please go to *www.epa.gov/ npdes* or see Docket ID. No. EPA–HQ–OW–2008–0055 at *www.regulations.gov.*

### C. National Research Council and Science Advisory Board Ballast Water Studies

As part of its strategy for improving the Agency's understanding of ballast water discharges, EPA, in partnership with the United States Coast Guard, commissioned two ballast water studies from highly respected, independent scientific entities. EPA commissioned these studies in order to produce the best possible scientific compendium of ballast water information relevant to the development of today's VGP. EPA commissioned these studies to help inform the Agency's decisions about what effluent limits to set for ballast water discharges.

The first study was led by the National Research Council (which functions under the auspices of the National Academy of Sciences (NAS), the National Academy of Engineering, and the Institute of Medicine) and addressed how to assess risk to water quality associated with ballast water discharges (NAS, 2011). For a copy of the NAS report, please go to: *http:// www.nap.edu/catalog.php?record_id= 13184.* The second study was led by EPA's autonomous Science Advisory Board (SAB) and evaluated the status of ballast water treatment technologies. For a copy of the SAB report, please see: *http://yosemite.epa.gov/sab/sab product.nsf/fedrgstr_activites/BW%20 discharge!OpenDocument&Table Row=2.3#2.*

### III. Scope and Applicability of the 2013 VGP

#### A. CWA Section 401 Certification and Coastal Zone Management Act

EPA may not issue a permit authorizing discharges into the waters of a State until that State has granted certification under CWA section 401 or has waived its right to certify (or been deemed to have waived). 33 U.S.C. 1341(a)(1); 40 CFR 124.53(a). EPA gave each State, Tribe, and Territory as applicable over 9 months to certify, well over the 60 day regulatory norm for NPDES permits. EPA found that this 401 certification had unusual circumstances which warranted additional time (e.g., the permits regulate discharges of mobile point sources; they have broad applicability to the waters of every State and Tribe in the country). If a State believed that any permit condition(s) more stringent than those contained in the draft permits were necessary to meet the applicable requirements of either the CWA or State law, the State had an opportunity to include those condition(s) in its certification. 40 CFR 124.53(e)(1). A number of States provided such conditions in their certifications, and EPA has added them to the VGP pursuant to CWA section 401(d). 33 U.S.C. 1341(d).

Similarly, EPA may not authorize discharges under a general permit into waters of a State if the State objects with EPA's National Consistency Determination, pursuant to the regulations implementing of the Coastal Zone Management Act ("CZMA"), specifically the regulations at 15 CFR 930.31(d) and 930.36(e). If the State coastal zone management agency objects to the general permit, then the general permit is not available for use by potential general permit users in that State unless the applicant who wants to use the general permit provides the State agency with the applicant's consistency determination and the State agency concurs. 15 CFR 930.31(d). NOAA has explained that "a State objection to a consistency determination for the issuance of a general permit would alter the form of CZMA compliance required, transforming the general permit into a series of case by case CZMA decisions and requiring an individual who wants to use the general permit to submit an individual consistency certification to the State agency in compliance with 15 CFR part 930." 71 FR 788, 793.

#### B. Geographic Coverage of VGP

The permit is applicable to discharges incidental to the normal operation of a vessel (identified in Part 1.2 of the VGP and section 3.5 of the VGP fact sheet) into waters subject to this permit, which means "waters of the U.S." as defined in 40 CFR 122.2, except as otherwise excluded by Part 6 of the permit. This includes the territorial seas, defined in section 502(8) of the CWA, extending to three miles from the baseline. *Pacific Legal Foundation* v. *Costle,* 586 F.2d 650, 655–656 (9th Cir. 1978); *Natural Resources Defense Council, Inc.* v. *U.S. EPA,* 863 F.2d 1420, 1435 (9th Cir. 1988).

The general permit will cover vessel discharges into the waters of the U.S. in all states and territories, regardless of whether a state is authorized to implement other aspects of the NPDES permit program within its jurisdiction, except as otherwise excluded by Part 6 of the VGP. While, pursuant to CWA section 402(c), EPA typically is required to suspend permit issuance in authorized states, EPA may issue NPDES permits in authorized states for discharges incidental to the normal operation of a vessel because section 402(c)(1) of the Clean Water Act prohibits EPA from issuing permits in authorized states only for "those discharges subject to [the state's authorized] program." Discharges formerly excluded under 40 CFR 122.3 are not "subject to" authorized state programs. The vessel discharges that will be covered by the permit are discharges formerly excluded from NPDES permitting programs under 40 CFR 122.3. (See discussion of the vacatur of this exclusion above.) Therefore the discharges at issue are not

considered a part of any currently authorized state NPDES program. See 40 CFR 123.1(i)(2) (where state programs have a greater scope of coverage than "required" under the federal program, that additional coverage is not part of the authorized program) and 40 CFR 123.1(g)(1) (authorized state programs are not required to prohibit point source discharges exempted under 40 CFR122.3).

## C. Categories of Vessels Covered Under VGP

The VGP applies to owners and operators of non-recreational vessels that are 79 feet (24.08 meters) and greater in length. The types of vessels covered under the VGP include cruise ships, ferries, barges, mobile offshore drilling units, oil tankers or petroleum tankers, bulk carriers, cargo ships, container ships, other cargo freighters, refrigerant ships, research vessels, emergency response vessels, including firefighting and police vessels, and any other vessels operating in a capacity as a means of transportation. Vessels of the Armed Forces of the United States are not eligible for coverage by this permit. The discharges eligible for coverage under this permit are those covered by the former exclusion in 40 CFR 122.3(a) prior to its vacatur.

## D. Summary of VGP and Significant Changes from the Proposed VGP

### 1. Ballast Water

Today's final permit contains numeric technology-based effluent limitations that are applicable to vessels with ballast water tanks and over time will largely replace the non-numeric effluent limitations (BMPs) for ballast water in the 2008 VGP. These limitations will achieve significant reductions in the number of living organisms discharged via ballast water into waters subject to this permit. Ballast water discharges are widely recognized as one of the primary sources (or vectors) for the spread of aquatic invasive species, also known as aquatic nuisance species (ANS). When species in ballast tanks are transported between waterbodies and discharged, they have potential for establishing new, non-indigenous populations that can cause severe economic and ecological impacts. EPA has expressed the numeric effluent limit for ballast water discharges as numbers of living organisms per cubic meter of ballast water (i.e. as a maximum acceptable concentration) because reducing the concentration of living organisms will reduce inoculum densities of potential invasive species discharged in a vessel's ballast water, i.e., thereby reducing the

risk posed by the discharge. Today's permit also contains maximum discharge limitations for certain biocides and residuals to limit the impact of these pollutants to waters subject to this permit. The final permit also allows most vessels which meet the treatment requirements to no longer perform ballast water exchange. Under the VGP, vessel owner/operators subject to the concentration-based numeric discharge limitations are able to meet these limits in one of four ways: treat ballast water to meet the applicable numeric limits of the VGP prior to discharge; transfer the ship's ballast water to a third party for treatment at an NPDES permitted facility; use treated municipal/potable water as ballast water; or not discharge ballast water. As in the 2008 VGP, vessels enrolled in, and meeting the requirements of the U.S. Coast Guard's Shipboard Technology Evaluation Program (STEP) would be deemed to be in compliance with the numeric limitations.

As in the 2008 VGP, EPA has included certain mandatory practices for all vessels. These requirements are consistent with EPA's Science Advisory Board's recommendations to reduce risks at multiple points in the vessel's operations (See EPA SAB 2011, available at *http://yosemite.epa.gov/sab/sabproduct.nsf/fedrgstr_activitss/6FFF1BFB6F4E09FD852578CB006E0149/$File/EPA-SAB-11-009-unsigned.pdf*). Some of the mandatory practices for all vessels equipped with ballast water tanks that operate in waters of the U.S are to: avoid the discharge of ballast water into waters subject to this permit that are within or that may directly affect marine sanctuaries, marine preserves, marine parks, shellfish beds, or coral reefs; minimize or avoid uptake of ballast water in the listed areas and situations; clean ballast tanks regularly to remove sediments in mid-ocean or under controlled arrangements in port, or at drydock; when feasible and safe, vessels must use ballast water pumps instead of gravity draining to empty your ballast water tanks (to remove larger living organisms); and minimize the discharge of ballast water essential for vessel operations while in the waters subject to this permit. EPA estimated the cost and burden of the ballast water requirements in its economic analysis for the permit.

EPA has determined that Best Available Technology Economically Achievable (BAT) over time will be a function of a vessel's construction date, size, and class. The VGP imposes several best management practices (BMPs) for vessels until they are required to meet the numeric ballast

water limits that EPA has found to be available, practicable and economically achievable. These interim requirements are substantially similar to those in the 2008 VGP. One of the interim management measures is that all vessels which operate outside of the Exclusive Economic Zone (EEZ) that are equipped to carry ballast water and enter the Great Lakes via the Saint Lawrence Seaway System must conduct ballast water exchange or saltwater flushing (as applicable) of ballast water tanks 200 nautical miles from any shore before entering either the U.S. or Canadian waters of the Seaway System.

For certain existing vessels, EPA proposed a staggered implementation schedule to require the vessel to meet the numeric effluent limitations by the first drydocking after January 1, 2014 or January 1, 2016 depending on vessel size, which may extend beyond the permit term for certain vessels. EPA has finalized this schedule. However, EPA has adjusted the date in the final VGP defining "new build" vessels—which are vessels that are subject to numeric limits immediately upon the effective date of today's permit—from those vessels that are newly constructed after January 1, 2012 to those that are newly constructed after December 1, 2013. EPA notes that this time schedule is consistent with the timelines set forth in the U.S. Coast Guard's March 2012 final ballast water discharge standard rulemaking.

In today's permit, the numeric concentration-based treatment limits for ballast water discharges do not apply to some vessels, such as inland and certain seagoing vessels less than 1600 gross registered tons; vessels operating exclusively within a limited area on short voyages; unmanned, unpowered barges; and vessels built before January 1, 2009 that operate exclusively in the Laurentian Great Lakes (referred to as "Lakers"). The draft VGP would have required any vessel (not otherwise exempt) with greater than 8 cubic meters of ballast water capacity to meet the numeric ballast effluent limitations for ballast water. In response to comments questioning the availability of systems for these vessels, EPA reconsidered the issue and concluded that though technologies are promising for future development, numeric ballast water treatment limits for inland and seagoing vessels less than 1600 gross registered tons do not represent BAT at this time or over the life of the permit. Among other things, most ballast water treatment systems have been designed for larger vessels and/or vessels which only uptake or discharge ballast water on either end of longer voyages.

With respect to Lakers that are not subject to the numeric limits found in Part 2.2.3.5 of the VGP, EPA has expanded the definition of Lakers to include vessels that operate exclusively in the Laurentian Great Lakes (i.e., existing vessels that operate upstream of the waters of the St. Lawrence River west of a rhumb line drawn from Cap de Rosiers to West Point, Anticosti Island, and west of a line along 63 W. longitude from Anticosti Island to the north shore of the St. Lawrence River). After considering public comment, EPA has determined that effluent limits based on ballast water treatment do not reflect BAT for existing vessels operating exclusively in the Laurentian Great Lakes at this time. Today's VGP includes three management measures specific to Lakers which EPA believes reflect BAT, and represent common sense approaches to managing ballast water discharges for vessels when they have not installed ballast water treatment systems.

Additionally, as proposed, the final VGP requires vessels entering the Great Lakes utilizing a ballast water treatment system to conduct ballast water exchange or saltwater flushing (as applicable) in addition to meeting the numeric limits for ballast water once they apply: (1) The vessel operates outside the Exclusive Economic Zone (EEZ) and more than 200 nm from any shore and then enters the Great Lakes, and (2) the vessel has taken on ballast water that has a salinity of less than 18 ppt from a coastal, estuarine, or freshwater ecosystem within the previous month. If a vessel meeting the description in (1) is not taken on ballast water with a salinity of less than 18 ppt in the previous month, the master of the vessel would be required to certify to this effect as part of the ballast water recordkeeping requirements before entering the Great Lakes. EPA believes that such a requirement significantly reduces the risk of new invasions from vessels entering the Great Lakes, but the Agency, for reasons pertaining to the efficacy of the requirement in other aquatic environments, has not extended it to other U.S. waters. Please see section 4.4.3.9 of the VGP Fact Sheet for discussion.

### 2. Non-Ballast Water

Compared to the 2008 VGP, today's VGP imposes more prescriptive technology-based effluent limits in the form of Best Management Practices for discharges of oil to sea interfaces. The VGP requires that all powered vessels must use "environmentally acceptable lubricants" in their oil-to-sea interfaces

unless it is technically infeasible to do so. Based on public comment received on the proposal, EPA clarified that, by using the reference to "technically infeasible," EPA intends to refer to situations when: no EAL products are approved for use in a given application that meet manufacturer specifications for that equipment; users of products that are pre-lubricated (e.g., wire ropes) have no available alternatives manufactured with EALs; products meeting a manufacturers specifications are not available within any port in which the vessel calls; or changes to use an EAL must wait until the vessel's next drydocking. EPA expects that it will be technically feasible for a significant portion of vessel operators to use EALs, particularly for newly built vessels, during this permit term. These requirements will reduce the toxicity of thousands of gallons or more of oil leaked into U.S. waters every year.

In addition, EPA clarified that, even though the final permit requires that wire ropes or cables and other equipment must be thoroughly wiped down to remove excess lubricant before being placed into service and after periodic lubrication, wipe downs to remove excess lubricant are not required if doing so is deemed unsafe by the Master of the vessel.

Additionally, in the event that the permitting moratorium for commercial fishing vessels is not extended past December 18, 2014, today's permit will be available to authorize the discharge of fish hold effluent and will establish appropriate Best Management Practices for this discharge type after that date. Among other things, the proposed VGP contained a provision prohibiting the discard of unused bait overboard. In response to comments, the final VGP limits the scope this prohibition and clarifies that it applies only to unused live bait. Moreover, the prohibition does not apply to the unused live bait that is discharged into the same waterbody or watershed from which it was caught. The adjusted prohibition render it easy to implement and consistent with typical management practices regarding the use of live bait, while at the same time significantly reducing the risk of new invasive species (including fish pathogens) introductions attributable to the release of unused bait.

EPA has also included numeric limits for exhaust gas scrubber effluent that are generally consistent with those established by International Maritime Organization guidelines for this discharge type. Today's permit includes a revised discharge standard from washwater from the exhaust gas scrubber treatment system for pH. EPA

believes the revised limit is both technically feasible and will ensure the discharge does not pose an unacceptable risk to receiving water. The proposed pH limit of no less than 6.5 was modified to better align with the IMO guidelines, and therefore, the final VGP requires that the discharge washwater must have a pH of no less than 6.0 measured at the ship's overboard discharge. See discussion in section 4.4.26 of the VGP Fact Sheet for additional discussion.

The VGP contains monitoring requirements for certain larger vessels for ballast water, bilgewater, graywater, and/or exhaust gas scrubber effluent if they discharge into waters subject to the permit. EPA has included these monitoring requirements to assure treatment systems are performing as required (when applicable) and to generate additional information for EPA's future analyses. Based on public comments received on the proposed VGP, EPA has adjusted the frequency of monitoring for some or all parameters for each discharge type and/or applicability thresholds for vessels which must conduct monitoring. These revisions in the final VGP have generally resulted in a reduced burden for the regulated industry relative to the proposed VGP. EPA estimated the cost and burden of these requirements in its economic analysis for the permit. EPA had taken comment on more stringent 5 ppm bilgewater oil and grease discharge limits for new build vessels in the VGP; based upon further analysis, EPA decided to retain the 15 ppm limit in the final permit but plans to work with our international partners at the IMO to explore the issue further.

The final VGP requires new build vessels greater than 400 gross tons which discharge bilgewater into waters subject to this permit to annually collect a sample of the bilgewater effluent for analysis of oil using specified methods to demonstrate treatment equipment maintenance and compliance with this permit and record the reading on the oil content meter. If the vessel has a type-approved oil discharge monitoring system including an overboard discharge control unit that prevents bilgewater discharges above 5 ppm and has two consecutive years' worth of analytical monitoring results that are below 5 ppm for oil and grease during the permit term, a vessel may cease conducting the annual analytical bilgewater monitoring for the rest of the permit term.

### 3. Administrative Improvements

EPA has made several efficiency improvements, including clarifying that

**21944** **Federal Register** / Vol. 78, No. 71 / Friday, April 12, 2013 / Notices

electronic recordkeeping is allowed under the permit, eliminating duplicative reporting, and allowing consolidated reporting for certain vessels.

Under today's final VGP, permittees not required to submit a NOI are required to complete and keep a Permit Authorization and Record of Inspection (PARI) Form onboard their vessel at all times. The final VGP contains the PARI form requirement because the Agency believes it is an efficient way for the owner/operator to certify that they have read and agreed to comply with the terms of the permit, and demonstrate basic understanding of the permit's terms and conditions. In addition, the form will provide EPA (or its authorized representative) with a standardized foundation for conducting inspections. Under the final VGP, EPA has consolidated the one-time report and annual noncompliance report into one annual report. As discussed in the fact sheet for today's permit, EPA found that the 2008 VGP reporting requirements resulted in confusion among some permittees. EPA believes that having a single annual report that permittees must file, which can include all of the permittee's analytical monitoring results (as applicable) for the previous year, will reduce this confusion and result in better information for the Agency. Additionally, while the proposed VGP allowed operators of unmanned, unpowered barges to complete combined annual reports if they meet certain criteria, the final VGP expands the ability for certain vessels (unmanned unpowered barges and vessels under 300 gross tons) to submit a combined annual report, if they meet specified criteria, to maximize efficiency and reduce the burden on a significant portion of the regulated universe. Many of these vessels are fundamentally similar and have a limited number of discharges. Vessels less than 300 gross tons, as a class, tend to produce lower volumes of effluent than their larger ocean going counterparts. Hence, EPA has broadened the applicability of this provision in order to provide an efficient way to gather information by the agency without sacrificing data quality.

## IV. Analysis of Economic Impacts of VGP

EPA performed an economic analysis for the VGP to evaluate the incremental costs of requirements in the permit. This analysis is available in the docket for today's permit. A summary of the analysis follows.

### A. Analysis of VGP costs

EPA estimates that approximately 60,000 domestic flag and 12,400 foreign flag vessels would be covered under the VGP, but only a subset of these vessels would incur incremental costs as a result of the revised VGP requirements. To estimate the effect of revised permit requirements on an industry as a whole, EPA's VGP analysis takes into account previous conditions and determines how the industry would act in the future in the absence of revised permit requirements. The baseline for this analysis is full industry compliance with existing federal and state regulations, including the 2008 VGP in the case of vessels currently covered by that permit; and current industry practices or standards that exceed current regulations to the extent that they can be empirically observed. In addition, a number of laws and associated regulations (including the National Invasive Species Act; the Act to Prevent Pollution from Ships; the Comprehensive Environmental Response, Compensation, and Liability Act; the Organotin Anti-fouling Paint Control Act; and others) already cover certain discharges that would be subject to the new permitting regime. The overlap between revised permit requirements and existing regulations and practices is discussed at greater length in the economic analysis.

EPA estimated incremental compliance costs to commercial vessels associated with revised permit's practices and discharge categories identified and the paperwork burden costs. Incremental costs are understood to result from the inclusion of all commercial fishing vessels 79 feet or larger under the VGP. As noted above, the moratorium on coverage for commercial fishing vessels and vessels less than 79 feet expires on December 18, 2014. Commercial fishing vessels 79 feet or larger will be covered by the VGP, and most non-recreational vessels less than 79 feet, including commercial fishing vessels, are expected to be covered by the sVGP. Changes in compliance costs also result from streamlining selected requirements, which is expected to reduce compliance costs for owners of certain vessels. Overall, EPA finds that revisions in the VGP requirements could result in aggregate annual incremental costs for domestic vessels ranging between $7.2 and $23.0 million (in 2010$). This includes the paperwork burden costs and the sum of all practices for applicable discharge categories for all vessels estimated to be covered by the revised VGP. EPA notes that the total

national cost estimate may be overly conservative (i.e. an overestimate of costs attributable to the permit) due to the inclusion of costs associated with commercial fishing vessels. The total annual compliance costs resulting from the 2013 VGP is reduced by $627,635 to $2,296,526 for the first year of permit coverage year as these vessels are not required to obtain NPDES coverage until at least December 18, 2014.

The average per vessel compliance costs range between $51 and $7,004 per vessel. There is considerable uncertainty in the assumptions used for several practices and discharge categories and these estimates therefore provide illustrative ranges of the costs potentially associated with the 2013 VGP rather than incremental costs incurred by any given vessel owner. Tank ships have the highest average compliance costs; this is driven by potential incremental costs for oil tankers exclusively engaged in coastwise trade that may install and operate onboard ballast water treatment systems to meet the 2013 VGP requirements applicable to ballast water discharges.

To evaluate economic impacts of revised VGP requirements on the water transportation, fishing, and mining industries, EPA performed a firm-level analysis. The firm-level analysis examines the impact of any incremental cost per vessel to comply with the revised VGP requirements on model firms that represent the financial conditions of "typical" businesses in each of the examined industry sectors. More than ninety percent of the firms in the water transportation and fishing industries, and in the drilling oil and gas wells segment of the mining industry, are small, and EPA believes it is unlikely that firm-level impacts would be significant among large firms in this industry. Therefore, a firm-level analysis focuses on assessment of impacts on small businesses. To evaluate the potential impact of the final VGP on small entities, EPA used a cost-to-revenue test to evaluate the potential severity of economic impact on vessels and facilities owned by small entities. The test calculates annualized pre-tax compliance cost as a percentage of total revenues and uses a threshold of 1 and 3 percent to identify facilities that would be significantly impacted as a result of this Permit.

EPA applied a cost-to-revenue test which calculates annualized pre-tax compliance cost as a percentage of total revenues and used a threshold of 1 and 3% to identify entities that would be significantly impacted as a result of this Permit. The total number of entities

expected to exceed a 1% cost-to-revenue threshold ranges from 76 under low cost assumptions to 340 under high cost assumptions. Of this universe, the total number of entities expected to exceed a 3% cost-to-revenue threshold ranges from 5 under low cost assumptions to 30 under high cost assumptions. This is based out of 5,480 total small firms. Accordingly, EPA concludes that the VGP will not have a significant economic impact on a substantial number of small entities or other businesses.

### B. Benefits of the VGP

Although EPA was unable to evaluate the expected benefits of the permit in dollar terms due to data limitations, the Agency collected and considered relevant information to enable qualitative consideration of ecological benefits and to assess the importance of the ecological gains from the revisions. EPA expects that reductions in vessel discharges will benefit society in two broad categories: (1) Enhanced water quality from reduced pollutant discharges and (2) reduced risk of invasive species introduction and dispersal. With some of the most damaging invasive species having cost the U.S. economy upwards of 1 billion dollars each, the environmental and economic benefits of stopping and slowing new invasions introductions and dispersal are significant.

Because many of the nation's busiest ports are considered to be impaired by a variety of pollutants found in vessel discharges, reducing pollutant loadings from these discharges is expected to have benefits associated with the reduction of concentrations of nutrients, metals, oil, grease, and toxics in waters with high levels of vessel traffic.

### V. Executive Orders 12866 and 13563

Under Executive Order (EO) 12866 (58 FR 51735 (October 4, 1993)) EPA has determined that this action is a "significant regulatory action." Accordingly, EPA submitted this action to the Office of Management and Budget (OMB) for review under Executive Orders 12866 and 13563 (76 FR 3821) and any changes made in response to OMB recommendations have been documented in the docket for this action.

**Authority:** Clean Water Act, 33 U.S.C. 1251 et seq.

Dated: March 28, 2013.
**Ira W. Leighton,**
*Deputy Regional Administrator, EPA Region 1.*
Dated: March 28, 2013.
**Ramon Torres,**
*Acting Director, Caribbean Environmental Protection Division, EPA Region 2.*
Dated: March 28, 2013.
**Joan Leary Matthews,**
*Division Director, Clean Water Division, EPA Region 2.*
Dated: March 28, 2013.
**Jon M. Capacasa,**
*Director, Water Protection Division, EPA Region 3.*
Dated: March 28, 2013.
**James D. Giattina,**
*Director, Water Protection Division, EPA Region 4.*
Dated: March 28, 2013.
**Tinka G. Hyde,**
*Director, Water Division, EPA Region 5.*
Dated: March 28, 2013.
**William K. Honker,**
*Director, Water Quality Protection Division, EPA Region 6.*
Dated: March 28, 2013.
**Karen Flournoy,**
*Director, Wetlands and Pesticides Division, EPA Region 7.*
Dated: March 28, 2013.
**Derrith R. Watchman-Moore,**
*Assistant Regional Administrator, Office of Partnerships and Regulatory Assistance, EPA Region 8.*
Dated: March 28, 2013.
**John Kemmerer,**
*Acting Director, Water Division, EPA Region 9.*
Dated: March 28, 2013.
**Daniel D. Opalski,**
*Director, Office of Water and Watersheds, EPA Region 10.*
[FR Doc. 2013–08662 Filed 4–11–13; 8:45 am]
**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

**[EPA–HQ–OPP–2013–0025; FRL–9383–7]**

### Notice of Receipt of Pesticide Products; Registration Applications To Register New Uses

**AGENCY:** Environmental Protection Agency (EPA).
**ACTION:** Notice.

---

**SUMMARY:** This notice announces receipt of applications to register new uses for pesticide products containing currently registered active ingredients pursuant to the provisions of section 3(c) of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), as amended.

This notice provides the public with an opportunity to comment on the applications.
**DATES:** Comments must be received on or before May 13, 2013.
**ADDRESSES:** Submit your comments, identified by docket identification (ID) number and the EPA Registration Number or EPA File Symbol of interest as shown in the body of this document, by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the online instructions for submitting comments. Do not submit electronically any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute.

• *Mail:* OPP Docket, Environmental Protection Agency Docket Center (EPA/DC), (28221T), 1200 Pennsylvania Ave. NW., Washington, DC 20460–0001.

• *Hand Delivery:* To make special arrangements for hand delivery or delivery of boxed information, please follow the instructions at *http://www.epa.gov/dockets/contacts.htm.* Additional instructions on commenting or visiting the docket, along with more information about dockets generally, is available at *http://www.epa.gov/dockets.*
**FOR FURTHER INFORMATION CONTACT:** A contact person is listed at the end of each registration application summary and may be contacted by telephone, email, or mail. Mail correspondence to the Registration Division (7505P), Office of Pesticide Programs, Environmental Protection Agency, 1200 Pennsylvania Ave. NW., Washington, DC 20460–0001. As part of the mailing address, include the contact person's name, division, and mail code.
**SUPPLEMENTARY INFORMATION:**

### I. General Information

#### A. Does this action apply to me?

You may be potentially affected by this action if you are an agricultural producer, food manufacturer, or pesticide manufacturer. The following list of North American Industrial Classification System (NAICS) codes is not intended to be exhaustive, but rather provides a guide to help readers determine whether this document applies to them. Potentially affected entities may include:

• Crop production (NAICS code 111).
• Animal production (NAICS code 112).
• Food manufacturing (NAICS code 311).
• Pesticide manufacturing (NAICS code 32532).